DECISION AND JUDGMENT ENTRY
This is an appeal from a judgment of the Scioto County Juvenile Court granting permanent custody of Rebecca Ward's five minor children to the Scioto County Children Services Board ("SCCSB").
The SCCSB has been involved in providing social services to Rebecca Ward and her five children since at least 1992. The services were initiated on a voluntary basis to address problems of medical neglect and poor living conditions. The services included intervention to ensure that the children's medical needs were met, as well as counseling for Ms. Ward in budgeting, time management, and parenting skills. All of the children suffer from various physical and/or psychological problems.
The children were first removed from the home in December 1996 based on allegations of deplorable living conditions and safety hazards. Specifically, the SCCSB investigator found dog feces throughout the home, dirty dishes, molded food, electrical hazards, and a broken window. The children were placed with their maternal grandmother, Richie Rebecca Crawford.
In March 1997, Ms. Crawford notified the SCCSB that Maggie, the oldest girl, was acting out in a sexually explicit manner. Upon investigation, Maggie accused D.J. Keaton — (Ms. Crawford's live-in boyfriend) — of sexual abuse. The children were removed from the grandmother's home, and Rebecca Ward was informed of the allegations. Maggie underwent a physical examination at the Children's Hospital in Columbus, Ohio. The results of the examination were consistent with sexual abuse, and the SCCSB substantiated the allegation. Law enforcement officials interviewed D.J. Keaton, but there is no evidence of record that he was ever charged with a crime. The children were placed back with their mother in December 1997.
In January 1998, the SCCSB received another referral indicating that D.J. Keaton had again sexually abused Maggie after she had returned to live with her mother. SCCSB workers interviewed Maggie and confirmed the allegations. Ms. Ward admitted that she had allowed D.J. Keaton to have access to all of the children on several occasions after they returned to live with her in December 1997. The second alleged incident of sexual abuse occurred when Ms. Ward allowed the children to stay overnight with their grandmother while Mr. Keaton was present. In addition, the SCCSB substantiated allegations that all five children were again living in filthy, hazardous conditions.
On January 15, 1998, the SCCSB initiated its complaint alleging that the children were neglected and dependant, and requesting both an order for temporary emergency custody and permanent custody. The trial court issued the temporary custody order that same day. A probable cause hearing was scheduled on January 16, 1998, but it was continued to allow service of process on the parents. The trial court ordered that custody of the children remain with the SCCSB pending rescheduling of the hearing. A hearing on February 17, 1998 was also continued to allow Kirk Crabtree, the father of Kristopher Crabtree, to obtain legal counsel. Following a hearing on March 17, 1998, the trial court found that probable cause had existed in support of the temporary order issued on January 15, 1998.
The trial court held an adjudicatory hearing on April 9, 1998. In an entry dated April 20, 1998, the trial court found the children to be neglected and ordered the matter set for dispositional hearing. At the dispositional hearing on April 30, 1998, Ms. Ward indicated that she had never been personally served, although the Sheriff's return indicated otherwise. As a result, the trial court had Ms. Ward personally served by the bailiff prior to entering the courtroom, vacated the finding of neglect, and re-set the case for hearing. The court conducted additional hearings on October 20, 1998, December 22, 1998, and February 11, 1999. On October 14, 1999, the trial court filed an order that granted permanent custody of all five children to the SCCSB, thereby terminating appellant's parental rights.
On November 12, 1999, Ms. Ward, the sole appellant, filed her Notice of Appeal. The appellant's assignments of error read:
 I. "THE COURT PREJUDICALLY ERRED IN REACHING ITS DECISION WITHOUT CONSIDERING AND WEIGHING FACTUALLY RELEVANT EVIDENCE OFFERED BY THE APPELLANTS, CONCERNING MRS. WARD'S PRESENT PARENTAL FITNESS, FROM THE DATE OF THE FILING OF THE ORIGINAL COMPLAINT, JANUARY 15, 1998."
 II. "THE COURT ERRED IN FINDING THAT SCCSB HAD PROVED BY CLEAR AND CONVINCING EVIDENCE THAT IT HAD MET THE REASONABLE EFFORTS REQUIREMENT, AS SET OUT IN CHAPTER 2151, AT REUNITING THE APPELLANT WITH HER CHILDREN OR THAT SUCH EFFORTS WOULD HAVE BEEN FUTILE AS THE COURT'S FINDING WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
There are two means by which an authorized agency may obtain permanent custody of a child under Ohio Law. The agency may either request permanent custody as part of its original abuse, neglect, or dependency complaint, or it may first obtain temporary custody and then subsequently file a motion for permanent custody. R.C. 2151.413 and R.C.2151.27(C), see, also, In re Massengill (1991), 76 Ohio App.3d 220,601 N.E.2d 206, 208. In this case, the SCCSB sought permanent custody in its complaint of January 15, 1998.
R.C. 2151.414(B) governs granting of permanent custody. In order to grant permanent custody as the initial dispositional order, the court must determine that the permanent commitment is in the best interest of the child under R.C. 2151.414(D) and that the child cannot be placed with one of his parents within a reasonable time or should not be placed with either parent under R.C.2151.414(E). The appellant does not challenge the trial court's finding regarding the best interest of the children. Rather, the appellant challenges the findings concerning R.C. 2151.414(E).
R.C. 2151.414(E) provides:
 "In determining * * * whether a child cannot be placed with either parent within a reasonable time or should not be placed with the parents, the court shall consider all relevant evidence. If the court determines, by clear and convincing evidence, * * * that one or more of the following exist as to each of the child's parents, the court shall enter a finding that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent.
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties.
* * *
 (4) The parent has demonstrated a lack of commitment toward the child by * * * actions showing an unwillingness to provide an adequate permanent home for the child;
* * *
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect." (emphasis supplied)
In this case, the trial court found clear and convincing evidence of the existence of the conditions specified in R.C. 2151.414(E)(1), (4) and (14) even though it did not specifically reference these subsections in its findings.
Clear and convincing evidence is defined as the "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief of conviction as to the allegations sought to be established." State v. Schiebel
(1990), 55 Ohio St.3d 71, 74, 564 N.E.2d 54, 60. Even where the burden of proof is "clear and convincing", an appellate court will not reverse the decision of a lower court if it is supported by "some competent, credible evidence." Id. at 74.
 I
In her first assignment of error, the appellant argues that the trial court failed to consider evidence showing that she improved her living conditions and fitness as a parent after the SCCSB filed its complaint in January of 1998. The appellant contends that the trial court failed to consider evidence that her physical condition improved; she bought a home on land contract; she secured employment; and her mother no longer lived with her, thereby eliminating the threat to her children from Ms. Crawford's boyfriend.
The appellant points to a statement by the trial court, which she claims shows that it refused to consider this evidence. At the end of the hearing on December 22, 1998, the appellant moved for an order requiring the SCCSB to investigate and file a report regarding the present conditions of the appellant's home. In response to this oral motion, the court stated:
 "The decision as to whether or not the court's going to grant permanent custody of these children to Children Services Board will be based on facts that were present at the time of the filing of the complaint. Not upon what's taken place since then."
The appellee argues that the trial court was referring to adjudicative findings of neglect, not to the custody disposition. However, it is unnecessary for us to determine the exact context of the trial court's statement. The record clearly shows that the trial court did in fact admit and consider evidence of improvements occurring after the filing of the complaint in applying R.C. 2151.414(E). In its findings and order of October 14, 1999, the trial court wrote:
 "[Ms. Ward's] * * * health problems have improved. She has purchased a home. She has obtained full-time employment. However, the underlying problems which led to the removal of the children remain. Ms. Ward lacks the parenting and disciplinary skills. She exhibits little or no control over the children. During visits at the Board, there is little interaction between the mother and her children. The maternal grandmother of the children (in whose home Maggie was sexually abused on two (2) occasions) visits with the children. In addition, the perpetrator of the abuse, the grandmother's boyfriend, continues his relationship with the grandmother and even came to a visitation at the agency. He even attended the hearing in this matter on December 22, 1998, some two (2) days after he allegedly separated from the maternal grandmother. Although Ms. Ward testified that her mother and the perpetrator had separated and gone their separate ways, upon cross-examination, Ms. Ward (the mother) admitted that this separation had occurred only two (2) days prior to the date of that hearing (December 22, 1998 — some 11 months after the petition for permanent custody was filed on January 15, 1998). The court places no credibility on the statement that they have separated. Having heard the evidence, it is the court's conclusion that their separation was done for purposes of testimony at the December 22, 1998 hearing. To the extent that the relationship between the grandmother and her boyfriend-perpetrator continues, he will have access to these children. The mother has demonstrated that she cannot or will not protect her children."
The findings show that the trial court gave considerable discussion to the evidence in question, but ultimately concluded that appellant's fitness to care for and protect her children had not improved. It is not the duty of this court to reweigh the evidence.Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77, 80,461 N.E.2d 1273, 1276. The trial court is in the best position to determine the credibility of proffered testimony. In light of the well known rule that a court speaks through its journal entries, see State v. King (1994), 70 Ohio St.3d 158,162, and the fact that the court's order indicates it considered events after the filing of the complaint, we find no error here. The first assignment of error is overruled.
 II
In the second assignment of error, the appellant argues that the trial court's finding concerning the reasonable reunification efforts requirement set out in Chapter 2151 was against the manifest weight of the evidence. The appellant contends that the SCCSB was obligated to continue reunification efforts after the complaint was filed for permanent custody on January 15, 1998; but that it ceased any meaningful services aimed at reunification after that time. The appellee responds that it had no duty to attempt to reunify Ms. Ward with her children in a case where the initial complaint seeks permanent custody. Furthermore, even if it has such a duty, appellee contends that the evidence establishes the futility of efforts at reunification after January 15, 1998.
The SCCSB did not have a duty to continue efforts to reunify Ms. Ward with her children after it filed the complaint for permanent custody. See, In the Matter ofJames C., et al. (Aug. 20, 1999), Lucas Co. App. No. L-98-1258, unreported. An agency need not give every parent an opportunity to correct the situation that caused removal of the child. Id. "It is axiomatic that a parent's statutory right to a reunification plan does not apply in the context of actions seeking permanent custody." In re Cooperman
(Jan. 19, 1995), Cuyahoga App. No. 67239, unpublished,citing In re Pachin (1988), 50 Ohio App.3d 44, 47-48. The trial court can award permanent custody to a children services agency even though little or no efforts are made to return the child to his or her home if the evidence supports a finding that it is in the child's best interest and the child should not be returned to the parents. In reScott (Aug. 22, 1997), Marion App. No. 9-97-N, unreported,citing In re Kwanza Lee Stevens (July 16, 1993), Montgomery App. No. 13523, unreported.
However, when R.C. 2151.414(E)(1) is a basis for granting permanent custody as the initial disposition, an agency must have given the parent a case plan and an opportunity to correct the situation that caused the removal. In the Matter of James C., supra. R.C. 2151.414(E)(1) by its own terms requires reasonable case planning efforts. The focus of R.C. 2151.414(E)(1) is on the efforts made to remedy the problemsafter the child is removed from the home. The plain language of R.C.2151.414(E)(1) precludes an interpretation that it refers only to conditions existing at the time of the child's removal. See: In re Scott (Sept. 17, 1999), Lucas App. No. L-99-1012, unreported, ("Absent any evidence of agency efforts to reunification after the children's removal from the home, an R.C. 2151.414(E)(1) predicate finding cannot be sustained.") If an agency chooses to argue that the parent did not rectify the cause(s) for removal, then the parent must have an opportunity to do so. Furthermore, a case plan relating to a prior matter cannot be used to satisfy this requirement where the agency seeks permanent custody as the initial disposition.
The trial court made the following finding:
 "The parent, Ms. Ward, up to the time the petition for permanent custody was filed and notwithstanding reasonable efforts of the Board and all other social service agencies, failed continuously and repeatedly to remedy those conditions which led to the removal of the children."
The evidence shows that the SCCSB did not make reasonable efforts to reunite the family after January 1998. Thus, the trial court erred as a matter of law in the finding relating to R.C. 2151.414(E)(1).
However, this error does not require reversal. The trial court found the existence of two other criteria under R.C. 2151.414(E)(4) and (14), neither of which the appellant contests.[1] R.C. 2151.414(E) is explicit that a finding of "one or more" conditions mandates a finding that the child cannot or should not be placed with the parent. See In re Robinson, (Sept. 15, 1997), Scioto Co. App. No. 97 CA 2503, unreported and In re Queen, (July 29, 1993), Pickaway Co. App. No. 93 CA 11 for the proposition that only one of the statutory conditions needs to exist before a court must find that a child cannot or should not be placed with the parent. Moreover, none of the other factors listed in R.C. 2151.414(E) require a case plan or time to remedy the situation. Because the court's erroneous finding under R.C. 2151.414(E)(1) can only be harmless error in this context, we affirm the judgement. Therefore, the appellant's second assignment of error is overruled.
 JUDGMENT ENTRY
It is ordered that the JUDGMENT BE AFFIRMED and that Appellee recover of Appellant costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Scioto County Common Pleas Court, Juvenile Division, to carry this judgment into execution.
Any stay previously granted by this Court is hereby terminated as of the date of this entry.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure. Exceptions.
KLINE, P.J.: Concurs in Judgment Only
ABELE, J.: Concurs in Judgment and Opinion
[1] Dating back to 1992, the SCCSB substantiated seven findings of abuse and/or neglect involving the children — including Maggie's two sexual abuse allegations in 1997 and 1998.
Prior to January 1998, Ms. Ward allowed animals in the home which exacerbated her son, Jacob's, skin condition. She allowed Arek's cleft palate to remain untreated for six or seven years, notwithstanding evidence that it should have been surgically corrected at about age one. The surgery was completed while he was in foster care. And she allowed Allison to go without proper dental care.
The children were first removed from the home in 1996 based on allegations of unsanitary and hazardous living conditions. They were placed back with their mother in December 1997 following Maggie's first alleged sexual abuse incident. Angela Reed, an SCCSB investigator, testified that she notified Ms. Ward of the allegations, and that Ms. Ward accompanied them to Columbus for Maggie's physical examination. In addition, Ms. Daily testified that she discussed Maggie's allegations with Ms. Ward many times before the children returned in December 1997. She stated that she informed Ms. Ward that D.J. Keaton was the alleged perpetrator, and that she counseled Ms. Ward not to allow the children to spend time with him. Also, Ms. Daily testified that Ms. Ward had a very clean, new home in December 1997, and that the children were in good health at that time.
Nevertheless, within six weeks of returning to live with their mother, the children were again removed from the home and the SCCSB filed its complaint in the case sub judice for permanent custody. Since getting her children back in December 1997, Ms. Ward had allowed D.J. Keaton to be around her children, including overnight stays at her mother's home when Mr. Keaton was present. As a result, Maggie alleged a second incident of sexual abuse involving D.J. Keaton. The second incident was substantiated by a physical examination in February 1998. Ms. Ward testified that she had allowed her children to be around D.J. Keaton because she thought he had passed a lie detector test, and thus was not a threat to their safety.
In addition, there is evidence that Ms. Ward allowed her house to become filthy and hazardous after getting her children back in December 1997. Ms. Reed testified that, on January 15, 1999, there were animals in the home. Maggie was inappropriately dressed for the weather conditions. Jacob's skin condition had not been properly treated. There was exposed electrical wiring protruding from the ceiling in one of the bedrooms. There was an open pill bottle in the bedroom. And there was spoiled food throughout the home.
Furthermore, Ms. Daily testified that she had been the caseworker for Ms. Ward and her children since 1995, and that Ms. Ward had made minimal changes since she started working with them. She said that one of the problems was that Ms. Ward would not follow through. She would do just enough to get the case closed. Ms. Daily testified that she was opposed to the children going back to live with their mother, and that she had no intent to reunite the family. She stated that she had diligently worked with Ms. Ward for four years, and concluded that she was an unfit parent.